NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LIBERTY LINCOLN-MERCURY INC., et al., | |
| Plaintiffs, | Civ. No. 02-4146(WGB) |
| vs. | **M E M O R A N D U M** |
| | **O P I N I O N** |
| FORD MOTOR COMPANY, | |
| Defendant. | |

APPEARANCES:

Eric L. Chase, Esq.
Genevieve K LaRobardier, Esq.
Christopher G. Massey, Esq.
Jacqueline R. Trussell, Esq.
BRESSLER AMERY & ROSS
A Professional Organization
325 Columbia Turnpike
Florham Park, NJ 07932

        Attorneys for Plaintiffs

Carey P. DeDeyn, Esq.
Carla W. McMillian, Esq.
Jennifer M. Rubin, Esq.
SUTHERLAND, ASBILL & BRENNAN, LLP
999 Peachtree Street, NE
Atlanta, GA 30309-3996

Dennis F. Lafiura
PITNEY HARDIN LLP
200 Campus Drive
Florham Park, NJ 07932-0950

        Attorneys for Defendant

**BASSLER, SENIOR DISTRICT JUDGE:**

        Ford Motor Company ("Ford") applies a surcharge to the

wholesale automobile prices it charges its dealers.  Fifty-eight

New Jersey Ford and Lincoln-Mercury automobile dealers have sued Ford for implementing this surcharge on the basis that the surcharge violates the New Jersey Franchise Practices Act ("NJFPA").[1]  The NJFPA provides that a motor vehicle franchisor "shall reimburse" its franchisee for parts used in warranty repairs at the franchisee's "prevailing retail price," provided that the retail price is "not unreasonable."  N.J.S.A. § 56:10-15(a).  Ford claims that the surcharge is a legal recovery of the costs Ford incurs for complying with the NJFPA and moves for partial summary judgment.  Plaintiffs cross-move for partial summary judgment.

For the reasons below, this Court **grants** Plaintiffs' motion for partial summary judgment on Count One and **denies** Plaintiffs' motion for partial summary judgment on Counts Two, Three, Five, Six and Nine.  The Court further **denies** Ford's motion for partial summary judgment on Count One and **grants** Ford's motion for partial summary judgment on Counts Two, Three and Five through

---

[1]Plaintiffs 12 count complaint alleges claims for (Count 1) violation of the NJFPA, N.J.S.A. 56:10-15, (Count 2) violation of the NJFPA, N.J.S.A. 56:10-7, (Count 3) violation of the Automobile Dealer's Day in Court Act, (Count 4) violation of the Robinson Patman Act, (Count 5) breach of contract, (Count 6) breach of implied covenant of good faith and fair dealing, (Count 7) unjust enrichment and conversion, (Count 8) estoppel, (Count 9) quantum meruit, (Count 10) wrongful manipulative accounting and demand for accounting, (Count 11) accounting misrepresentation, (Count 12) unconscionability.

Twelve.[2]

The Court has jurisdiction over this matter under 28 U.S.C. § 1337 and 28 U.S.C. § 1331 for Ford's alleged violations of the Robinson-Patman Act and the Automobile Dealer's Day in Court Act and supplemental jurisdiction under 28 U.S.C. § 1367.  Venue also is proper pursuant to 28 U.S.C. § 1391(c).

**I.   BACKGROUND**

Ford manufactures motor vehicles, which are sold to a nationwide network of independent franchised dealers.  Every new Ford brand vehicle is accompanied by a new vehicle limited warranty.  The warranty provides that Ford will effect the repair or replacement of vehicle components under certain circumstances and with certain time and mileage limitations.  Ford will also effect a repair when a part used in a prior service repair, paid either by Ford or the vehicle owner, fails during that part's express, limited warranty period or the vehicle's limited warranty period, whichever is longer.  A consumer may also purchase an extended service plan ("ESP") which covers the vehicle beyond the basic warranty.

As part of their Agreement with Ford, franchised dealers must perform warranty work for purchasers of Ford brand vehicles, regardless of whether the individual dealer sold the vehicle in

_____

[2]The only count that neither party seeks partial summary judgment on is Count Four (Violation of the Robinson Patman Act).

question to the customer.  Ford reimburses the dealers for limited warranty or ESP warranty repairs and for work that must be performed on Ford vehicles that are recalled.  Ford also voluntarily pays a portion of non-warranty repair work done to maintain customer satisfaction, known as goodwill.

When parts are used by a dealer in performing warranty work in most states, Ford reimburses the dealer for the dealer's cost of those parts, plus a standard national mark-up of 40% for most parts.  Therefore, the standard reimbursement amount is 140% of dealer costs.

In New Jersey, however, the NJFPA provides that a "motor vehicle franchisor shall reimburse" its franchisee for parts used in warranty repairs at the franchisee's "prevailing retail price," provided that the retail price is not unreasonable. N.J.S.A. § 56:10-15(a).[3]  On June 1, 2002, Ford implemented a

---

[3]N.J.S.A. § 56:10-15(a) fully provides that:

If any motor vehicle franchise shall require or permit motor vehicle franchisees to perform services or provide parts in satisfaction of a warranty issued by the motor vehicle franchisor . . . [t]he motor vehicle franchisor shall reimburse each motor vehicle franchisee . . . and such parts as are supplied, in an amount equal to the prevailing retail price charged by such motor vehicle franchisee for such . . . parts in circumstances where . . . such parts [are] supplied other than pursuant to the warranty; provided that such motor vehicle franchisee's prevailing retail price is not unreasonable when compared with that of [other franchisees] from the same motor vehicle franchisor for identical merchandise . . . in the geographic area in which the motor vehicle franchisee is engaged in

4

surcharge in New Jersey to recover the costs of complying with the warranty reimbursement requirements of the NJFPA.   Ford claims that this surcharge is distinct from the surcharge-known as the dealer parity surcharge-that Ford had imposed solely on Liberty Lincoln Mercury, Inc. ("Liberty") in 1992, which had resulted in litigation and was deemed violative of the NJFPA by the Third Circuit Court of Appeals.

**A.   Dealer Parity Surcharge**

In 1991, Liberty wrote to Ford asking to be reimbursed for warranty parts at its retail rate of 77% above costs pursuant to the NJFPA.   Although Ford agreed to reimburse Liberty after several months of correspondence, Ford informed Liberty that it would apply a dealer parity surcharge ("DPS")to the wholesale price of each vehicle purchased by Liberty.   The DPS was calculated by taking the incremental reimbursement cost of complying with the NJFPA (the difference between the 77% markup and defendant's standard  40% warranty parts markup) and dividing it by the total number of vehicles invoiced to Liberty.

In June 1995, Liberty filed a suit against Ford for imposing the DPS on Liberty after it sought Ford's compliance with the NJFPA.   The New Jersey District Court ruled that Ford's practice was illegal as it effectively permitted Ford to circumvent the

_____

business.

5

statute's requirements.  The Third Circuit affirmed the District Court and agreed with the District Court's view that Ford was "engaged in a shell game, the purpose of which is to avoid, altogether, the costs of complying with the NJFPA." Liberty Lincoln-Mercury Inc. v. Ford Motor Co., 134 F.3d 557, 561 (3d Cir. 1998)("Liberty")(citing Liberty Lincoln-Mercury Inc. v. Ford Motor Co., 923 F.Supp. 665, 669 (D.N.J. 1996)).  The Court held that "in reducing Liberty to 'the same position as if it were reimbursed the standard thirty to forty percent above cost,' 923 F.Supp. At 669, the DPS scheme violated the 'clear language of the NJFPA' by denying Liberty reimbursement at its prevailing retail rate." Liberty, 134 F.3d at 566.

### B.  New Jersey Cost Surcharge

Under the current New Jersey Cost Surcharge ("NJC Surcharge"), Ford applied a statewide per vehicle surcharge to all vehicles purchased by New Jersey dealers for retail sale regardless of the total amount of warranty work performed by the dealer or the dealer's warranty parts reimbursement mark-up.  The surcharge was derived by calculating Ford's projected total statewide incremental costs of future compliance with the NJFPA and then dividing that amount by the total number of anticipated vehicle sales to all New Jersey dealers.  The initial NJC Surcharge was $125, which Ford increased to $157 on May 5, 2003 to more accurately reflect Ford's increased costs.

## II.  DISCUSSION

Plaintiffs argue that Ford's implementation of the NJC Surcharge is virtually indistinguishable from the DPS in the earlier Liberty case.  Ford claims that not only are the DPS and NJC Surcharge different, but the NJC Surcharge is the type of surcharge that the Third Circuit expressly stated was acceptable. Ford notes that the Third Circuit held that the DPS "functioned not as a **wholesale vehicle price term** carried out through unregulated vehicle sales transactions, but rather as a warranty reimbursement policy that automatically eliminated any reimbursement beyond Ford's standard rate resulting . . . in no payment at retail."  134 F.3d at 564.  (emphasis added).  Ford claims that the NJC Surcharge, in contrast, is a "wholesale vehicle price term" because it is added to the wholesale price of each vehicle purchased by a New Jersey dealer.  Ford admits, however, that this number is based upon the statewide incremental costs of future compliance with the NJFPA and can be adjusted to more accurately reflect Ford's actual costs.[4]

Ford further insists that the NJC Surcharge more closely resembles the surcharge that the First Circuit held did not violate Maine's warranty reimbursement statute.  The First

---

[4]The calculation used to determine the NJC Surcharge is similar to the calculation used to ascertain the DPS except that total figures for all New Jersey dealers are used instead of figures for one particular dealer.

Circuit in <u>Acadia v. Ford Motor Co.</u>, 44 F.3d 1050 (1st Cir. 1995), reversed the district court's ruling that it was improper for Ford to institute a $160 warranty parity surcharge to recover the increased costs of complying with a Maine statute similar to the NJFPA.

The Maine statute required that Ford reimburse its dealers "at the retail rate customarily charged by that franchisee for the same parts when not provided in satisfaction of a warranty." 10 M.R.S.A. § 1176 (Supp. 1993).[5] The court noted that it is "quite commonplace for manufacturers and other regulated entities to pass on to retailers and consumers their costs of complying with regulatory statutes." <u>Acadia</u>, 44 F.3d at 1056. Furthermore, the court held that nothing in the legislative history indicated, either expressly or implicitly, that warranty reimbursement costs could not be passed on by manufacturers to dealers, and then from dealers to consumers. Therefore, the court ruled that it could not reasonably or fairly infer, that the legislature intended to prohibit or condition manufacturer

---

[5]The Maine statute states:

If a motor vehicle franchisor requires or permits a motor vehicle franchisee to . . . provide parts in satisfaction of a warranty created by the franchisor, the franchisor . . . shall reimburse the franchisee for any parts so provided at the retail rate customarily charged by that franchisee for the same parts when not provided in satisfaction of a warranty.

10 M.R.S.A. § 1176

cost recovery.  Id. at 1056-57.

     Although Ford correctly notes that the Acadia court ruled
that Ford could recover its costs of doing business in Maine
through wholesale price increases, the court's decision was based
on its conclusion that the intent of the Maine statute was to
protect non-warranty customers not dealers.  44 F.3d at 1057,
n.9.[6]  Unlike the Maine statute, the NJFPA is a "remedial statute
intended to equalize the disparity of bargaining power in
franchisor-franchisee relationships."  Liberty, 134 F.3d at 566.

     Both parties agree that there are no genuine issues of
material fact and correctly note that this action rests on the
interpretation of previous case law.  Ford's Reply Memorandum in

_____

     [6]As Plaintiffs point out, the Acadia court apparently was
wrong in their assessment that the Maine statute did not intend
to protect dealers.  Plaintiffs' Opposition Memorandum (Pls.
Opp.") at 14.  After the Acadia ruling, the Maine Legislature
amended the statute to provide in relevant part that: "A
franchisor may not otherwise recover its costs for reimbursing a
franchisee for parts and labor pursuant to this section."  L.D.
1294 § 10, 121st Leg., 1st Reg. Sess. (Me. 2003).  Contrary to
Ford's contention (See Ford's Reply Memorandum in Support of
Partial Summary Judgment ("Ford's Rep. Mem.") at 3, n.5) that
this statute has yet to be deemed constitutional (in all fairness
to Ford, after it made this statement), the First Circuit ruled
that the statute was constitutional and did not violate the
Commerce Clause or the Contracts Clause.  Alliance of Automobile
Manufacturers v. Gwadosky, 430 F.3d 30 (1st Cir. 2005).
Additionally, the court held that the purpose of the statute was
to prevent an unfair price differential between warranty and non-
warranty repair that the Maine legislature reasonably viewed as
detrimental to consumers and motor vehicle dealers alike.  Id. at
38.  The court further held that Ford's actions revealed the
existence of a loophole in the retail-rate reimbursement
provision that the recoupment bar was designed to plug.  Id.

Support of Partial Summary Judgment ("Ford Rep. Mem.") at 2; see also Plaintiffs' Opposition Memorandum ("Pls. Opp. Mem.") at 6. The Court finds that even more important is how the interpretation of N.J.S.A. 56:10-15(a) impacts this case, as no court has been faced with the exact set of facts that are at issue here.

**A. Statutory Interpretation**

The primary goal of a court in interpreting a statute is to discern and give effect to the legislative intent in light of the language used and the objects the legislature sought to achieve by enacting the statute. Burns v. Belafsky, 166 N.J. 466, 473 (2001)(citing State v. Hoffman, 149 N.J. 564, 578 (1997)). The search of legislative intent begins with the language of the statute. First Resolution Inv. Corp. v. Seker, 171 N.J. 502, 511 (2002). "If the statute is clear and unambiguous on its face and admits of only one interpretation, we need delve no deeper than the act's literal terms to divine the Legislature's intent." State v. Thomas, 166 N.J. 560, 567 (2001)(quoting State v. Butler, 89 N.J. 220, 226 (1982)). Only when the language of the statute is ambiguous should courts look beyond the words of the statute to its history, policy or other extrinsic aids to ascertain statutory intent. Cedar Cove, Inc. v. Stanzione, 122 N.J. 202, 213 (1991).

10

**NJFPA, N.J.S.A. 56:10-15** (Count One)

Under New Jersey law, remedial statutes, like the NJFPA, must be construed broadly to give effect to their legislative purpose.  Lemelledo v. Beneficial Mgmt. Corp. of America, 289 N.J. Super. 489, 674 A.2d 582, 585 (1996).  Although Ford argued in the Liberty case that nothing in the plain language of the statute prohibited Ford from recouping the costs of complying with the NJFPA, the Circuit Court rejected its argument.  134 F.3d at 567.  The Court held that "the DPS, by automatically reducing Liberty's reimbursements below-retail rates, violates NJFPA's clear mandate that the franchisor 'shall reimburse' the franchisee for warranty parts 'in an amount equal to the prevailing retail price.'"  Liberty, 134 F.3d at 565 (citing N.J.S.A. § 56:10-15(a)).

Based on Ford's current surcharge, no dealer will be reimbursed for warranty parts at the prevailing retail rate because the amount that the dealer would receive pursuant to N.J.S.A. 56:10-15(a) is reduced by the NJC Surcharge.  Ford, on the other hand, recovers all of the money that it incurs as a result of the statute and clearly has stated that the surcharge will be adjusted to reflect any inaccuracies in the amount that it should recover.[7]  The Court finds that–as the Third Circuit

_____

[7]Ford adjusted the surcharge less than one year after it instituted the surcharge to reflect warranty reimbursement amounts that it was not able to recover from the original

held in <u>Liberty</u>-it cannot be the case that the "[franchisee-
dealers]-the class of intended beneficiaries-bear the entire
burden." 134 F.3d at 568. Such a result would be unfair and
contravenes the purpose of the NJFPA.

Ford asserts, however, that the NJC Surcharge fits into one
of the hypothetical situations in which the Third Circuit and
District Court in <u>Liberty</u> intimated <u>might</u> be an acceptable cost
recovery system under the statute. 134 F.3d at 563 (the district
court did not "forbid methods of cost recovery involving
wholesale prices"); 923 F.Supp. at 669 ("This is not even a case
in which all New Jersey Lincoln-Mercury dealers are subject to
the same surcharge regime as a result of the NJFPA"). The Court
finds, however, that Ford is still engaged in the type of "shell
game," that the Third Circuit found was prohibited by the NJFPA.

The Court's position is supported by the legislative history
of the statute, which states that the NJFPA "is designed to
remove the franchisor's present opportunity to isolate himself
from the warranty he issues." Legislative Statement, Assembly
No. 1956 (May 24, 1976). Additionally, the NJFPA "offers
protection to the competent retailer against arbitrary actions by
manufacturers who too often hold a life-and-death power over his
business and his ability to serve his customers." <u>Id.</u> The
legislature clearly intended to provide dealers with

surcharge.

reimbursement of warranty parts at the "prevailing retail price."
N.J.S.A. § 56:10-15(a).

The Court further rejects Ford's argument that the NJC
Surcharge is an appropriate cost recovery system because
regulated entities frequently pass statutory compliance costs on
to retailers.  The Court is just as unpersuaded by this argument
as the Third Circuit, which ruled that "compliance costs which
Ford shifted to Liberty were not incidental to compliance with an
independent regulatory mandate, such as a vehicle safety standard
or an environmental regulation, but rather were the very subject
of the substantive regulation at issue."  134 F.3d at 567.  The
Court further stated that:

> we agree with the district court that a construction of
> the NJFPA permitting machinations which ultimately fail
> to afford the dealer reimbursement for warranty parts
> at its retail rate would 'fly in the face of the intent
> of the New Jersey legislature . . . and would undermine
> the purpose of the Act.'

Id. (citing 923 F.Supp. at 669-70).

Ford cites to other statements made by the Third Circuit in
Liberty to dispute these conclusions.  For instance, Ford notes
that the Liberty Court stated that "we agree with Acadia's
holding that the statutes at issue do not preclude cost-recovery
systems effected through wholesale vehicle price increases, but
reject Ford's contention that the DPS constitutes such a system."
The Court notes, however, that the Third Circuit was speaking in
dicta and did not have the present facts before it to make a

ruling on this particular issue that would be binding on this Court.[8]  This Court finds that Ford's NJC Surcharge, like the DPS, violates the express language of the statute and frustrates its legislative purpose.  Therefore, Plaintiffs partial summary judgment motion on Count One is granted.[9]

**NJFPA, N.J.S.A. 56:10-7** (Count Two)

Section 56:10-7(e)[10] of the NJFPA prohibits any franchisor from imposing unreasonable standards of performance on a franchisee.  Similarly, Section 56:10-7.4(a) precludes a franchisor from imposing unreasonable standards of performance or unreasonable financial, operating or other requirements.  By requiring Plaintiffs to pay a $125 or $157 Surcharge, Ford did not impose standards that were unreasonable.  The surcharge does not constitute an unreasonable standard of performance merely because it violates the NJFPA as Plaintiffs suggest.  Plaintiffs' Memorandum Supporting Partial Summary Judgment Motion ("Pls. Supp. Mem.") at 16.

---

[8]Moreover, the District Court in the <u>Liberty</u> case noted that the assumption that franchisor-manufacturers can recover compliance costs from franchisee-dealers "may not be correct." 923 F.Supp. at 665.

[9]Plaintiffs concede at oral argument on February 23, 2006 that Plaintiffs will get complete relief if they win on Count One and that all other claims merge. 2/23/06 Tr. at 23.

[10]This statute provides that "it shall be a violation of this act for any franchisor, directly or indirectly, through any officer, agent or employee, to . . . impose unreasonable standards of performance upon a franchisee."

In the few New Jersey federal district court cases
addressing these two sections of the NJFPA, summary judgment was
denied where a fact issue existed concerning whether unreasonable
standards of performance were imposed on plaintiff.  Carlo C.
Gelardi Corp. v. Miller Brewing Co., 502 F.Supp. 637 (D.N.J.
1980)(fact issue existed regarding whether defendant's alleged
conduct made plaintiff's life "sufficiently miserable" forcing
plaintiff to quit distribution of defendant's product); see also
Dunkin' Donuts Inc. v. Dough Boy Mgmt., Inc., 2006 WL 20521, slip
op. at *11 (D.N.J. Jan. 3, 2006).

The District Court in New Jersey Coalition of Automotive
Retailers v. DaimlerChrysler Motors Corp., 107 F. Supp. 2d 495
(D.N.J. 1999) ("NJCAR"), noted that the $160 Surcharge Ford
instituted to recoup costs imposed by the Maine reimbursement
statute in Acadia was "considerably lower" than the $400
Surcharge DaimlerChrysler threatened to charge its customers if
they exercised their rights under the NJFPA.  The Court held that
the $400 surcharge was not in line with the manufacturer's
increased costs and therefore, constituted a penalty.  Id. at
500.  That is not the case here.  Although the Court finds that
the NJC Surcharge imposed by Ford is precluded by the NJFPA, the
Court does not believe that a reasonable jury could find that the
surcharge constituted an unreasonable standard of performance.

**B.    The Automobile Dealer's Day in Court Act,
        15 U.S.C. §§ 1221-1225** (Count Three)

15

In order to sustain a claim under the Automobile Dealer's Day in Court Act ("ADDCA"), a plaintiff must prove a breach of the manufacturer's duty to act in "good faith." 15 U.S.C. § 1222. Good faith is defined as the "duty of each party to a franchise . . . to act in a fair and equitable manner . . . so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation." 15 U.S.C. § 1221(e). The type of coercion or intimidation rendered actionable under the ADDCA occurs only when the automobile manufacturer makes a "wrongful demand which will result in sanctions if not complied with." Cutrone v. Daimler-Chrysler Motors Co.,LLC, No. 04-4259, 2005 WL 3487525, at *1 (3d Cir. Dec. 21, 2005) (citing Buono Sales, Inc. v. Chrysler Motors Corp., 449 F.2d 715, 724 (3d Cir. 1971)). Ford has not sought to coerce or intimidate Plaintiffs but has only sought to recover its increased costs for complying with the NJFPA. As the First Circuit in Acadia noted, it is commonplace for manufacturers to pass on to retailers and consumers their costs of complying with regulatory statutes. 44 F.3d at 1056. Furthermore, as discussed earlier, Ford attempted to develop a surcharge, which the Third Circuit in Liberty had intimated might be appropriate. See supra at 11. The Court does not find that Ford acted in bad faith by seeking to recover its cost of complying with the NJFPA.

16

C.   **Common Law Claims**[11]

**Breach of Contract** (Count Five)

Plaintiffs argue that Ford is in breach of the Sales and Service Agreement ("SSA") because 1) it unilaterally imposed the Surcharge without any additional consideration, 2) the SSA requires Ford to reimburse its dealers for warranty repairs and replacements, 3) the SSA prohibits inclusion of "charges for special items" in the dealer price, and 4) the SSA requires Ford to comply with all applicable federal and state law.  Pls. Supp. Mem. at 21-24; Pls. Opp. Mem. at 27.

First, the SSA states only that Ford must reimburse dealers, and does not state the rate at which it must reimburse its dealers.  Therefore, Ford's failure to reimburse dealers at the rate set by the N.J.S.A. 56:10-15(a) violates the statute, but does not breach the contract.  See NJCAR, 107 F. Supp. 2d at 502 (provisions of the NJFPA are not incorporated into the franchise agreement).  Furthermore, Paragraph 10 of the SSA expressly states that Ford reserves "the right at any time and from time to time to change or eliminate prices, charges, discounts, allowances, rebates, refunds or other terms of sales affecting

---

[11]New Jersey gives effect to contracting parties' private choice of law clauses unless they conflict with New Jersey public policy.  Stadium Chrysler Jeep v. DaimlerChrysler Motors Co., 324 F. Supp. 2d 587, 594 n.1 (D.N.J. 2004)(citing General Motors Corp. v. New A.C. Chevrolet, Inc., 263 F.3d 296, 304 (3d Cir. 2001)).  The Court does not find any conflict existing here; therefore, the Court will apply Michigan law.

COMPANY PRODUCTS." Certification of Christopher G. Massey
("Massey Cert.") at Ex. C. Although Plaintiffs have violated
N.J.S.A. 56:10-15(a) by implementing the NJC Surcharge, they have
not breached the express terms of the SSA.

Finally, Plaintiffs misinterpret the definition of "dealer
price." The definition is meant to help the reader understand
the term as it is used in the agreement. It expresses what is
and is not included when the term "dealer price" is mentioned in
the agreement; it does not preclude Ford from including a
surcharge in its "price to dealers" as Plaintiffs suggest.

### Covenant of Good Faith and Fair Dealing (Count Six)

As the Court discussed under the ADDCA, Plaintiffs have not
proven that Ford failed to act in good faith by implementing the
NJC Surcharge. See supra 16-17. Ford merely attempted to
recover its cost for complying with the NJFPA, which was similar
to the cost recovery system deemed appropriate in Acadia.
Although Ford was wrong in its assessment that its method was not
in violation of N.J.S.A. 56:10-15(a), Plaintiffs have not
convinced the Court that Ford breached the covenant of good faith
and fair dealing.

### Unjust Enrichment and Conversion (Count Seven)

For a plaintiff to succeed on an unjust enrichment claim,
she must prove that the defendant received a benefit, the
retention of which would be unjust without payment. B & M Die

18

Co. v. Ford Motor Co., 167 Mich. App. 176 (1988). "Unjust enrichment works to imply a contract to prevent one party from inequitably receiving and retaining a benefit from another." Stadium Chrysler Jeep, L.L.C., 324 F. Supp. 2d at 595 (citing Kuhfeldt v. Liberty Mut. Ins. Co., 833 F.Supp. 632, 636 (E.D. Mich. 1993)). This form of implied contract, however, will only apply if no express contract between the parties exists. Like the theory of quantum meruit, the Court will not apply the unjust enrichment theory where a more adequate remedy exists under N.J.S.A. 56 10:15. See infra 15.

**Estoppel** (Count Eight)

Plaintiffs appear to argue that Ford is collaterally estopped from arguing this case because "the earlier Liberty case . . . necessarily decided Ford's liability [which was] . . . identical on all material facts." Pls. Opp. Mem. at 28. The Court disagrees. The facts of that case are significantly different from the present case, which has presented complex issues of law for the Court. Plaintiffs' attempt to characterize these cases as "identical" is fallacious.

**Quantum Meruit** (Count Nine)[12]

Plaintiffs claim that they should be entitled to recovery

---

[12]As only Ford has addressed whether New Jersey or Michigan law should apply to Plaintiffs' claim for quantum meruit and the Court has found no significant differences in the law, the Court will use Michigan law.

under the quasi-contractual theory of quantum meruit.  Pls. Supp.
Mem. at 28.   Recovery in quantum meruit is based on the
acceptance of a benefit by one party, and the inequity of
allowing that party to retain the benefit without compensating
the performing party.  Gable v. Production Stamping, Inc., No.
230004, 2001 WL 951753, at *1 (Mich. Ct. App. Aug. 21, 2001).
Quantum meruit, like unjust enrichment, is inappropriate where an
express contract exists.  Hull & Smith Horse Vans, Inc. v.
Carras, 376 N.W.2d 392, 393 (Mich Ct. App. 1985).

     Plaintiffs acknowledge that the SSA requires Ford to
reimburse the dealer for warranty parts.  Massey Cert. at Ex. C ¶
4(b)(4).  Plaintiffs do not and cannot contend that Ford provides
no reimbursement for warranty parts but instead argue that they
are underreimbursed based upon the amounts deemed appropriate
under N.J.S.A. 56:10-15(a).  The Court finds that resolution of
this issue is more appropriately dealt with pursuant to NJFPA.
Everett v. Nickola, 599 N.W.2d 732, 735 (Mich. Ct. App. 1999)
(the equitable remedy of quantum meruit "is neither necessary nor
appropriate where a resolution under the law is available.")
Moreover, "[c]ourts are generally reluctant to create an implied-
in-law contract except where justice demands it."  Gable, 2001 WL
951753, at *2.  As Plaintiffs have an adequate remedy at law,
justice does not demand relief under the quantum meruit theory.

**Accounting** (Count Ten and Eleven)

As Plaintiffs concede, their accounting claims are pled
"alternatively," in the event Plaintiffs do not prevail on Count
One.  Since the Court has ruled in favor of Plaintiffs on Count
One, the Court grants Ford's partial summary judgment motion on
these claims.

**Unconscionability**(Count Twelve)

Plaintiffs claim that the NJC Surcharge is unconscionable
and "extortionate."  Plaintiffs' Second Amended Complaint ¶¶
179,181.  As discussed above (supra at 15), the Court does not
believe that the NJC Surcharge is excessive.  Ford's attempt to
recover its costs may violate the NJFPA, but Plaintiffs have
failed to show that the NJC Surcharge is so unfair and
unreasonable as to rise to the level of being unconscionable.
See Pack v. Damon Corp., 320 F.Supp. 2d 545, 556 (E.D. Mich.
2004).  Ford's partial summary judgment motion on Count Twelve is
therefore, granted.

**II. CONCLUSION**

For the reasons stated in this Opinion, this Court **grants**
Plaintiffs motion for partial summary judgment on Count One,
their claim that Ford's conduct violated 56:10-15(a), but denies
the remainder of Plaintiffs' partial summary judgment motion on
Counts Two, Three, Five, Six and Nine.   The Court, **denies** Ford's
motion for partial summary judgment on Count One, Plaintiffs'

21

claim that Ford violated 56:10-15(a), and grants its motion for partial summary judgment on Counts Two, Three and Five through Twelve.  Therefore, the only count that remains in this action is Count Four, Plaintiffs' claim that the NJC Surcharge violates the Robinson Patman Act.

An appropriate Order accompanies this Opinion.


 /s/ William G. Bassler
WILLIAM G. BASSLER, U.S.S.D.J.


Dated: March 30, 2006