**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LIBERTY LINCOLN-MERCURY, INC., et al.<br><br>Plaintiffs,<br><br>vs.<br><br>FORD MOTOR COMPANY,<br><br>Defendant. | Civil Action No.: 02-cv-4146 (PGS)<br><br><br>**OPINION** |

**SHERIDAN, U.S.D.J.**

Plaintiff Liberty Lincoln-Mercury, Inc. ("Liberty") and other franchised dealerships (collectively, "Plaintiffs") have filed suit against Ford Motor Company ("Defendant" or "Ford") seeking recovery for, among other things, violations of the New Jersey Franchise Practices Act ("NJFPA"), N.J.S.A. 56:10-1 et seq.  Previously, the Honorable William G. Bassler, U.S.D.J., entered summary judgment against Ford as to liability on count one of Plaintiffs' complaint. Plaintiffs now move for summary judgment as to damages.  The primary issue before the Court, as posed by the parties, is "whether Plaintiffs are entitled as a matter of law to reimbursement of a surcharge imposed by Ford" in connection with warranty service and repairs.[1]  For the following reasons, Plaintiffs' motion seeking reimbursement of the surcharge is denied.

---

[1] At this time, the Court does not address Plaintiffs' request for statutory interest, permanent injunctive relief, or counsel fees and costs.

## I.      BACKGROUND

Ford sells and distributes its vehicles and parts through a nationwide network of franchised dealerships, which include Plaintiffs.  Ford's franchised dealerships purchase vehicles from Ford at wholesale and sell them to customers at retail prices.[2]  When a customer purchases a new vehicle from a dealership, it is accompanied by a warranty issued directly by Ford (not the dealership) against certain manufacturing defects.  The warranty information is set forth on what is commonly referred to as a "Monroney Label," which is prominently displayed on a vehicle's window.  15 U.S.C. § 1232.  Ford, however, does not directly service the vehicles or replace parts pursuant to its warranties.  Rather, under Ford's Sales and Service Agreement with franchisees, Ford's franchised dealerships perform the required service and supply parts.

From 1976 until 1991, pursuant to a nationwide formula, Ford reimbursed Plaintiffs at 30-40% above cost for warranty parts.  Nonetheless, in December 1991, plaintiff Liberty requested reimbursement at 77% above cost for parts.  Liberty justified its request based upon the NJFPA, which generally governs the franchisor-franchisee relationship, and requires franchisors to pay franchised dealerships for warranty parts at the franchised dealership's "prevailing retail price."  The statute reads in pertinent part:

> If any motor vehicle franchise shall require or permit motor vehicle franchisees to perform services or provide parts in satisfaction of a warranty issued by the motor vehicle franchisor:
>
> a.      The motor vehicle franchisor shall reimburse each motor vehicle franchisee for such services as are rendered and for such parts as are supplied, in an amount equal to the prevailing retail price charged by such motor vehicle franchisee for such services and parts

---

[2] The parties quibble over the fact that Plaintiffs finance their purchase of vehicles from Ford through third-party lenders; they do not purchase vehicles directly.

in circumstances where such services are rendered or such parts supplied other than pursuant to warranty; provided that such motor vehicle franchisee's prevailing retail price is not unreasonable when compared with that of the holders of motor vehicle franchises from the same motor vehicle franchisor for identical merchandise or services in the geographic area in which the motor vehicle franchisee is engaged in business.

b.      The motor vehicle franchisor shall not by agreement, by restrictions upon reimbursement, or otherwise, restrict the nature and extent of services to be rendered or parts to be provided so that such restriction prevents the motor vehicle franchisee from satisfying the warranty by rendering services in a good and workmanlike manner and providing parts which are required in accordance with generally accepted standards.  Any such restriction shall constitute a prohibited practice hereunder.

c.      The motor vehicle franchisor shall reimburse the motor vehicle franchisee pursuant to subsection a. of this section, without deduction, for services performed on, and parts supplied for, a motor vehicle by the motor vehicle franchisee in good faith and in accordance with generally accepted standards, notwithstanding any requirement that the motor vehicle franchisor accept the return of the motor vehicle or make payment to a consumer with respect to the motor vehicle pursuant to the provisions of P.L.1988, c.123 (C.56:12-29 et seq.).

d.      For the purposes of this section, the "prevailing retail price" charged by a motor vehicle franchisee for parts means the price paid by the motor vehicle franchisee for those parts, including all shipping and other charges, multiplied by the sum of 1.0 and the franchisee's average percentage markup over the price paid by the motor vehicle franchisee for parts purchased by the motor vehicle franchisee from the motor vehicle franchisor and sold at retail.  The motor vehicle franchisee may establish average percentage markup under this section by submitting to the motor vehicle franchisor 100 sequential customer paid service repair orders or 90 days of customer paid service repair orders, whichever is less, covering repairs made no more than 180 days before the submission, and declaring what the average percentage markup is.  The average percentage markup so declared shall go into effect 30 days following the declaration subject to audit of the submitted repair orders by the motor vehicle franchisor and adjustment of the average percentage markup based on that audit.

3

Only retail sales not involving warranty repairs, parts covered by subsection e. of this section, or parts supplied for routine vehicle maintenance, shall be considered in calculating average percentage markup. No motor vehicle franchisor shall require a motor vehicle franchisee to establish average percentage markup by a methodology, or by requiring information, that is unduly burdensome or time consuming to provide, including, but not limited to, part by part or transaction by transaction calculations. A motor vehicle franchisee shall not request a change in the average percentage markup more than twice in one calendar year.

\* \* \* \*

N.J.S.A. 56:10-15. The purpose of the NJFPA is to prevent "arbitrary actions by manufacturers who too often hold a life-and-death power over his [dealership's] business and his ability to serve his customers." *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, No. Civ. 02-4146 (WGB), 2006 WL 1098178, at *4 (D.N.J. March 31, 2006) (citing Legislative Statement, Assembly No. 1956 (May 24, 1976)).

On July 7, 1992, after several months of correspondence, Ford approved Liberty's request and agreed to reimburse Liberty at the requested 77% mark-up for parts, even though Liberty was the only New Jersey dealership to make such a request.[3] However, on November 5, 1992, Ford informed Liberty that it would apply a dealer parity surcharge ("DPS") to the wholesale price of each vehicle purchased by Liberty in an effort to recover the increased cost of complying with its demands. The DPS was calculated by taking the difference between the 77% requested mark-up and 40% existing mark-up and dividing it by the total number of vehicles invoiced to Liberty.

In response to the DPS, in June 1995, Liberty filed suit against Ford. On March 14, 1996, the Honorable Maryann Trump Barry, U.S.D.J., entered summary judgment as to liability against

---

[3] If Ford did not make the requested reimbursement within 30 days, it would be subject to a 12% annual interest rate. N.J.S.A. 56:10-13.5.

Ford finding that the DPS violated the NJFPA.  *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*,
923 F. Supp. 665 (D.N.J. 1996).  On January 22, 1998, following entry of final judgment, the Third
Circuit affirmed.  *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 134 F.3d 557 (3d Cir. 1998).
According to the Third Circuit, Ford was not forbidden from adopting policies to recover the cost
of complying with the NJFPA, but noted that the DPS "bore no economic relationship between
Liberty's wholesale vehicle purchases."  *Id.* at 563.  Instead, the DPS was "exacted as an automatic
result of, and in direct proportion to, Liberty's incremental warranty reimbursement claims."  *Id.*

   Following the Third Circuit's ruling, on June 1, 2002, Ford implemented the New Jersey Cost
Surcharge (the "Cost Surcharge") as a mechanism to recoup its increased costs.  Under the Cost
Surcharge, Ford applied a statewide per vehicle surcharge to all vehicles purchased by franchised
dealerships regardless of the total amount of warranty work performed by the dealerships.  The Cost
Surcharge was calculated by projecting Ford's cost of compliance with the NJFPA and dividing that
amount by the total number of anticipated vehicle sales to New Jersey dealerships.  The initial Cost
Surcharge was $125.00, but it increased to $157.00 on May 5, 2003.  The Cost Surcharge appeared
as a separate line item on new vehicle invoices.

   On August 23, 2002, Plaintiffs filed suit against Ford alleging that its Cost Surcharge violated
the NJFPA, just like the DPS.  On March 31, 2006, the Honorable William G. Bassler, S.U.S.D.J.,
granted summary judgment against Ford as to liability for violations of the N.J.S.A. 56:10-15.
*Liberty Lincoln-Mercury*, 2006 WL 1098178.  In making his ruling, Judge Bassler, like the Third
Circuit, acknowledged that the NJFPA does not "preclude cost-recovery systems effectuated through
wholesale vehicle price increases."  *Id.* at *5.  Nonetheless, Judge Bassler rejected Ford's argument
that NJFPA was an acceptable cost-recovery system, and he distinguished the holding of *Acadia v.*

*Ford Motor Co.*, 44 F.3d 1050 (1st Cir. 1995), wherein the First Circuit held that Ford had not violated a Maine warranty reimbursement statute. Judge Bassler reasoned that the Cost Surcharge, "violates the express language of the statute and frustrates its legislative purpose." *Id.* at *5. The Court did not make any ruling regarding damages. Nor did the Court suggest an alternative cost-recovery methodology, which would have provided guidance to Ford and Plaintiffs moving forward.

Although summary judgment as to liability was granted nearly four years ago, the parties have yet to complete discovery. According to Defendant, 41 of 64 Plaintiff dealerships have not been deposed. It is clear from the discovery conducted, however, that Plaintiffs passed on the Cost Surcharge to new vehicle purchasers in the form of higher retail prices and/or deducted the amount of the Cost Surcharge from salespersons' commissions.

Instead, both parties have sought final resolution to this case through additional motion practice. On April 17, 2009, Defendant filed what it styled as a "motion to correct a clear legal error;" essentially, a motion for reconsideration of Judge Bassler's March 31, 2006 decision. On May 4, 2009, Plaintiffs opposed Defendant's motion and moved for summary judgment as to damages. On October 20, 2009, the Court denied Defendant's motion, finding that Defendant failed to meet the high burden required for reconsideration. The Court now considers Plaintiff's motion for summary judgment as to damages.[4]

_____

[4] Plaintiffs further sought summary judgment with respect to engine and transmission assembly reimbursement pursuant to N.J.S.A. 56:10-15(e). However, at oral argument on January 25, 2010, the parties advised the Court that this discrete issue was or would soon be settled.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (internal quotations omitted).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985).  The party opposing the motion for summary judgment cannot rest on mere allegations. *Anderson*, 477 U.S. at 248.  "[U]nsupported allegations" are insufficient to defeat summary judgment. *Schoch v. First Fidelity Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990).  Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgement.  *Anderson*, 477 U.S. at 247-48.  If a court determines, "after drawing all inferences in favor of [the non-moving party], and making all credibility determinations in his favor -- that no reasonable jury could find for him, summary judgment is appropriate." *Alevras v. Tacopina*, 226 Fed. Appx. 222, 227 (3d Cir. 2007).

### III.    DISCUSSION

A determination of whether Plaintiffs are entitled to summary judgment as to damages rests largely on principles of statutory interpretation.  Statutory interpretation is a process that always begins with the language of the statute.  *Dean v. U.S.*, 129 S. Ct. 1849, 1853 (2009); *accord Rosenberg v. XM Ventures*, 274 F.3d 137, 141 (3d Cir. 2001) ("Because it is presumed that [the legislature] expresses its intent through the ordinary meaning of its language, every exercise of statutory interpretation begins with an examination of the plain language of the statute.").  "Where the statutory language is plain and unambiguous, further inquiry is not required."  *Rosenberg*, 274 F.3d at 141.  "To determine whether the statutory language is ambiguous, [courts] must examine 'the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'"  *Id.* (quoting *Marshak v. Treadwell*, 240 F.3d 184, 192-93 (3d Cir.2001)).  "In addition, when interpreting a statute, courts should endeavor to give meaning to every word which is used and therefore should avoid an interpretation which renders an element of the language superfluous."  *Id.* (citing *United States v. State of Alaska*, 521 U.S. 1 (1997)); *accord In re Sussex County Mun. Utils. Auth.*, 198 N.J. Super. 214, 217 (App. Div. 1985). Courts should also "ordinarily resist reading words or elements into a statute that do not appear on its face."  *Dean*, 129 S. Ct. at 1853; *see also GE Solid State, Inc. v. Dir., Div. of Taxation*, 132 N.J. 298, 308 (1993) ("Under the established canons of statutory construction, where the Legislature has carefully employed a term in one place and excluded it in another, it should not be implied where excluded.").

N.J.S.A. 56:10-10 governs damages for Ford's liability under N.J.S.A. 56:10-15.  Pursuant to N.J.S.A. 56:10-10, a plaintiff is entitled to "damages sustained" and/or an injunction:

> Any franchisee may bring an action against its franchisor for violation
> of this act in the Superior Court of the State of New Jersey to recover
> damages sustained by reason of any violation of this act and, where
> appropriate, shall be entitled to injunctive relief. Such franchisee, if
> successful, shall also be entitled to the costs of the action including
> but not limited to reasonable attorney's fees.

"Damages sustained" is not defined in the NJFPA, but its plain meaning is relatively clear.  Damages is ordinarily defined as compensation for actual loss.  *Blacks Law Dictionary* 445 (9th ed. 2004) (Damages is "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury."); *accord id.* (Actual damages is "[a]n amount awarded to a complainant to compensate for a proven injury or loss; damages that repay actual losses.").  And "sustained" is defined as suffered or undergone. *Merriam Webster's Collegiate Dictionary* 1188 (10th ed. 1995).  Therefore, "damages sustained" means actual damages suffered.

Plaintiffs do not dispute the plain meaning of "damages sustained," but instead contend (and largely assume) that they are entitled to reimbursement (what Plaintiffs also call disgorgement) of the Cost Surcharge under N.J.S.A. 56:10-10.[5]  According to Plaintiffs, "Ford must repay in full what it was legally prohibited to charge, plus statutory interest, costs and reasonable counsel fees."  As a result, Plaintiffs suggest, summary judgment is appropriate because calculating reimbursement is simply a matter of arithmetic.

There are two fatal flaws in Plaintiffs' reading of the NJFPA.  First, the words reimbursement or disgorgement are not contained in N.J.S.A. 56:10-10, which only allows for two forms of relief, "damages sustained" and an injunction.  Given the inclusion of an injunction and the exclusion of

---

[5] Plaintiffs define "reimbursement" as "to pay back, to make restoration, to replay that expended; to indemnify, or make whole."

other forms of equitable relief, it would be inappropriate to read reimbursement or disgorgement into the statute.[6]   Second, if disgorgement was read into N.J.S.A. 56:10-10, it would render "damages sustained" largely superfluous.   *Rosenberg*, 274 F.3d at 141.   Disgorgement would always be equal to or greater than damages sustained.   Consequently, there would never be a reason or financial incentive to seek recovery for damages sustained if disgorgement were available.

Separate and apart from Plaintiffs' overly broad reading of N.J.S.A. 56:10-10, disgorgement is also not appropriate as a matter of equity.[7]   Disgorgement "wrests ill-gotten gains from the hands of a wrongdoer.   It is an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs."   *S.E.C. v. Hughes Capital Corp.*, 917 F. Supp. 1080, 1085 (D.N.J. 1996) (quoting *SEC v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993)), *aff'd* 124 F.3d 449 (3d Cir. 1997).   Although liable for its NJFPA violations, the Third Circuit has already determined that Ford's motives are entirely legitimate and "some methods of cost-recovery are permissible".   *See Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 134 F.3d 557 (3d Cir. 1998) (internal quotations omitted). Judge Bassler agreed by stating "Ford has not sought to coerce or intimidate Plaintiffs but has only sought to recover its increased costs for complying with the NJFPA."   *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, No. Civ. 02-4146 (WGB), 2006 WL 1098178, at * 6 (D.N.J. March 31, 2006). This case is different from another federal case where Chrysler "threatened its dealers" with

---

[6] As cited above, "reimbursement" is set forth in N.J.S.A. 56:10-15.   However, that section only determines liability.   Once a determination is made that liability exists, a court must still assess "damages sustained," if any.

[7] Although the Court declines to read disgorgement into the statute as a matter of construction it must still consider whether disgorgement is appropriate as a matter of equity. "[T]he comprehensiveness of . . . equitable jurisdiction is not to be denied or limited in the absence of clear legislative command."   *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946).

surcharge constituting "penalty". *N.J. Coalition of Automotive Retailers v. DaimlerChrysler Motors Corp.*, 107 F. Supp. 2d 495, 499-500 (D.N.J. 1999).  Accordingly, permitting disgorgement is not inconsistent with the actions of Ford.  Requiring disgorgement may also create "a remedy worse than the ills it seeks to cure." *Wheeling Steel Corp. v. Am. Rolling Mill Co.*, 82 F.2d 97, 100 (6th Cir. 1936); 30A C.J.S. Equity § 97 (June 2009); *cf. Dunkin' Donuts of Am., Inc. v. Middletown Donut Corp.*, 100 N.J. 166, 175 (1985) (cautioning against "creative equitable remedies" in applying the NJFPA).

Finally, Plaintiffs argue that requiring proof of actual damages sustained affords Ford the benefit of the so-called "passing-on" defense, which Plaintiffs contend is illegal.  Under the passing-on defense, a plaintiff's claimed losses for wholesale overcharges are reduced by any price increases passed on to consumers.  *See Acadia Motors, Inc. v. Ford Motor Co.*, 44 F.3d 1050, 1058 (1st Cir. 1995), *superceded by statute on other grounds as stated in Alliance of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30 (1st Cir. 2005).  For example, if a dealership paid a Cost Surcharge of $157.00 on a vehicle, and a customer paid $157.00 more for a vehicle as a result of the Cost Surcharge (or a salesperson's commission was reduced by $157.00), then Plaintiffs' actual damages sustained would be zero.[8]

Plaintiffs claim that the passing-on defense is illegal rests primarily on two cases, *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968) (overcharges resulted from antitrust violations) and *Abbotts Dairies Div. of Fairmont Foods, Inc. v. Butz*, 584 F.2d 12 (3d Cir. 1978) (overcharges made because of illegal milk-pricing order).[9]  However, neither *Hanover Shoe* nor

---

[8] Because the passing-on defense results in a calculation of damages sustained, Plaintiffs' argument is largely semantics.

[9] Plaintiffs also argue that the Third Circuit "already rule[] on Ford's passing-on defense." The Third Circuit, however, did not address the issue of damages.

*Abbotts Dairies* suggest that the passing-on defense is inapplicable to the unique circumstance of this case; that is, where franchisor is entitled to impose a wholesale price increase for additional warranty costs, but has technically violated a statute in the process, according to Judge Bassler's previous decision.  There is nothing nefarious about Ford's attempt to collect additional warranty costs.  On the contrary, in *Acadia*, the First Circuit specifically allowed the passing-on defense in interpreting its own version of the NJFPA.  44 F.3d at 1058.  According to *Acadia*, "the Dealers have not shown that they actually absorbed the cost of the surcharges and did not pass them on to their customers in the form of higher prices.  If the Dealers have passed on their costs, then awarding restitution of the surcharges would result in a windfall double recovery by the Dealers."  Although *Acadia* was eventually superceded by statute -- the Maine legislature amended its restriction on a franchisor's ability to recover reimbursement costs -- the First Circuit's ruling on damages is instructive.

Because Plaintiffs are limited to damages sustained under N.J.S.A. 56:10-10 and cannot obtain disgorgement or reimbursement of all Cost Surcharges, damages are not, as Plaintiffs suggests, a matter of simple arithmetic.  Accordingly, Plaintiffs' motion for summary judgment as to damages is denied.  *Cf. Acadia Motors*, 44 F.3d at 1058.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment as to damages is denied.


*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.


Dated: February 22, 2010